UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
In re:                                                                              Chapter 7

JERRY CHOEZ
and ROSALIN CHOEZ,                                                  Case No. 15-45404-ess

                Debtors.

---------------------------------------------------------------x
ALLIANCE SHIPPERS, INC.,                                      Adv. Pro. No. 16-01015-ess

                Plaintiff,

     -against-

JERRY CHOEZ,

                Defendant.
---------------------------------------------------------------x
JERRY CHOEZ,

                Counter-Claimant,

     -against-

ALLIANCE SHIPPERS, INC.,

                Counter-Defendant.
---------------------------------------------------------------x

## MEMORANDUM DECISION AFTER TRIAL

*Appearances*:

Ronald Horowitz, Esq.                                     Steven T. Beard, Esq.
Ronald Horowitz, Attorney at Law              Coran Ober P.C.
2561 Moody Boulevard, Suite D                   25-02 Francis Lewis Boulevard
Flagler Beach, FL 32136                                  Flushing, NY 11358
 *Attorneys for Plaintiff*                                  *Attorneys for Defendant*
 *Alliance Shippers, Inc.*                                 *Jerry Choez*

**HONORABLE ELIZABETH S. STONG**
**UNITED STATES BANKRUPTCY JUDGE**

## Introduction

Before the Court is the amended complaint of plaintiff Alliance Shippers, Inc.

("Alliance") and the counterclaim of Jerry Choez in this adversary proceeding.  Alliance seeks a

determination that the debt that Mr. Choez initially owed to Alliance's predecessor-in-interest,

Felix Produce Corp. ("Felix Produce"), and now owes to Alliance, is nondischargeable under

Bankruptcy Code Section 523(a)(4).  Mr. Choez seeks a declaratory judgment that the default

judgment entered on September 14, 2009, in *Felix Produce Corp. v. New Lots Food Corp. and*

*Jerry Choez*, Docket No. 08-CV-5161, in the United States District Court for the Eastern District

of New York, is void for lack of personal jurisdiction.

On January 26, 2018, the parties filed a Joint Pre-Trial Statement identifying two issues

to be determined at trial – whether a trust was created under the Perishable Agricultural

Commodities Act ("PACA"); and if so, whether Mr. Choez committed a fiduciary defalcation

with respect to that trust.

The trial of this action took place on July 16 and 17, 2018, and the Court heard testimony

from two witnesses, a senior Alliance executive and Mr. Choez.  Post-trial briefing was

completed on August 20, 2018, and the record is now closed.

## Jurisdiction

Alliance's nondischargeability claim arises under Bankruptcy Code Section 523(a)(4)

and is a core matter.  28 U.S.C. § 157(b)(2)(I).  This Court may hear Mr. Choez's counterclaim

because it is a "counterclaim[] by the estate against [a] person[] filing [a] claim[] against the

estate."  28 U.S.C. § 157(b)(2)(C).  As core matters, this Court has constitutional authority to

enter a final judgment because the claims alleged in the amended complaint stem "from the bankruptcy itself." *Stern v. Marshall*, 564 U.S. 462, 499 (2011).

In addition, to the extent that they are not core proceedings, this Court may adjudicate these claims pursuant to Judiciary Code Section 157(c)(2) because the parties have stated their consent to the entry of a final judgment here. *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1940 (2015) (holding that in a non-core proceeding, a bankruptcy court may enter final orders "with the consent of all the parties to the proceeding"). For these reasons, this Court has jurisdiction to consider and enter judgment on these claims under Judiciary Code Section 1334(b) and the Standing Order of Reference dated August 28, 1986, as amended by Order dated December 5, 2012, of the United States District Court for the Eastern District of New York.

## Selected Procedural History

The following procedural and background information is drawn from the extensive record in this adversary proceeding, and familiarity with the record is assumed.

### *The Default Judgments*

Two unrelated default judgments, one entered in federal district court in Brooklyn and the other entered in state court in New Jersey, form the background to this dischargeability action. In one, Felix Produce was the plaintiff, and in the other, Felix Produce was the defendant.

In 2008, Felix Produce commenced an action, captioned *Felix Produce Corp. v. New Lots Food Corp d/b/a Bravos Supermarket, Krasdale Foods Inc., and Jerry Choez*, Docket No. 08-CV-5161, in the United States District Court for the Eastern District of New York (the "District Court") against Mr. Choez and New Lots Food Corp. ("New Lots Food"), a business owned and operated by Mr. Choez, seeking payment under PACA for perishable agricultural commodities that Felix Produce sold to New Lots Food (the "District Court Action"). On September 16,

2009, the District Court entered a default judgment in favor of Felix Produce and against New Lots Food and Mr. Choez, jointly and severally, in the amount of $30,735.45 (the "District Court Judgment").

Separately, and several years after the District Court Action was concluded, Alliance brought an action in the Superior Court of New Jersey, Law Division, Middlesex County (the "New Jersey Superior Court"), against Felix Produce, among others, to collect on a debt owed to it. On October 11, 2013, the New Jersey Superior Court entered a default judgment in favor of Alliance and against Felix Produce, among others, in the amount of $23,330.

Alliance brought a second action in the New Jersey Superior Court against Mr. Choez and New Lots Food, to collect on the District Court Judgment. On October 20, 2015, the New Jersey Superior Court entered a default judgment in favor of Alliance and against Mr. Choez and New Lots Food, among others, in the amount of $25,723.

### The Debtors' Bankruptcy Cases

On April 8, 2010, Mr. Choez and his wife, Rosalin Choez, filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, Case No. 10-43026. On May 25, 2010, the Debtors' bankruptcy case was dismissed pursuant to Bankruptcy Code Section 521(i), effective as of that date, and on May 26, 2010, the Debtors' bankruptcy case was closed.

On July 22, 2010, the Debtors filed a second voluntary petition for relief under Chapter 7 of the Bankruptcy Code, Case No. 10-46896. On September 8, 2010, the Debtors' second bankruptcy case was likewise dismissed pursuant to Bankruptcy Code Section 521(i), effective as of September 7, 2010, and on September 20, 2010, the Debtors' second bankruptcy case was closed.

On November 30, 2015, the Debtors filed a third voluntary petition for relief under

Chapter 7 of the Bankruptcy Code, Case No. 15-45404.  The Debtors' third bankruptcy case

followed a different path, and on December 28, 2015, the Chapter 7 Trustee, Robert J. Musso,

filed a report of no distribution.  And on February 24, 2016, the Debtors each received a

discharge.

*This Adversary Proceeding*

As the record reflects, the parties have engaged in extensive motion practice in this

action, including motions to dismiss, a motion for summary judgment, and a motion to

reconsider.

On January 19, 2016, Alliance commenced this adversary proceeding by filing a

complaint.  On January 19, 2016, Mr. Choez filed a motion to dismiss.  On February 11 and 29,

2016, the Court held hearings on the motion to dismiss, at which Mr. Choez and Alliance, each

by counsel, appeared and were heard.  By Memorandum Decision dated June 3, 2016, the Court

granted Mr. Choez's motion to dismiss, and allowed leave to replead on grounds that "Alliance

has shown that 'the prospect of a plausible claim is suggested' by the allegations of the

Complaint."  *Alliance Shippers, Inc. v. Choez (In re Choez),* 2016 WL 3244861, at *11 (Bankr.

E.D.N.Y. June 3, 2016).

On June 29, 2016, Alliance filed this amended complaint.  Alliance alleges that Mr.

Choez is or was a person in control of, and responsible for, the disposition of the assets of New

Lots Food, including its PACA trust assets.  Am. Compl. ¶ 6, ECF No. 15.  Alliance also alleges

that, following a default judgment in the District Court Action in favor of Felix Produce and

against New Lots Food and Mr. Choez, jointly and severally, Mr. Choez and Felix Produce did

not receive payment of the $30,735.45 judgment.  Am. Compl. ¶¶ 7, 8.  And Alliance alleges that

it brought an action in the Superior Court of New Jersey, Docket No. MID-L-2024-12, against

Krisp-Pak Sales Corp. ("Krisp-Pak") and was awarded a judgment of $369,700, which remains

unsatisfied.  Am. Compl. ¶ 9.

In addition, Alliance alleges that Krisp-Pak was in the business of selling, and Felix

Produce was in the business of purchasing, wholesale quantities of perishable produce, that Felix

Produce was licensed as a dealer under PACA, and that Krisp-Pak delivered $23,330 of produce

to Felix Produce.  Am. Compl. ¶ 10.

Alliance asserts that, as an execution judgment creditor of Krisp-Pak, it brought an action

in the New Jersey State Court, Docket No. MID-L-2650-13, against Felix Produce and other

produce wholesalers.  Am. Compl. ¶ 11.  Alliance states that on February 20, 2015, an amended

judgment was entered against Felix Produce in the amount of $23,330 which, Alliance alleges,

remains unsatisfied.  Am. Compl. ¶ 12.  Alliance alleges that on March 6, 2015, it obtained an

order executing on the rights and credits due to Felix Produce from Mr. Choez, and permitting

Alliance to liquidate those rights and credits against Mr. Choez.  Am. Compl. ¶ 13.

On July 8, 2016, Mr. Choez moved to dismiss the amended complaint.  On September 15,

2016, and November 22, 2016, the Court held hearings on the motion, at which Mr. Choez and

Alliance, each by counsel, appeared and were heard.  On December 28, 2016, the Court issued

an oral decision and order denying Mr. Choez's motion to dismiss the amended complaint.

On January 17, 2017, Mr. Choez filed an answer and counterclaim.  Answer and

Countercl., ECF No. 32.  In his counterclaim, Mr. Choez seeks a declaratory judgment stating

that the District Court Judgment is void as a matter of law.  Answer and Countercl. ¶ 19.  Mr.

Choez asserts that he was not served with the summons and complaint in that action, and as a

result, that the District Court did not have personal jurisdiction over him.  Answer and Countercl.

¶¶ 19, 22, 24.  On February 6, 2017, Alliance filed an answer to the counterclaim.  Countercl.

Answer, ECF No. 33.

On May 10, 2017, Mr. Choez filed a motion for summary judgment.  Mr. Choez argued

that he is entitled to summary judgment on his counterclaim and on Alliance's Section 523(a)(4)

claim.  With respect to his counterclaim, Mr. Choez argued that the District Court Judgment is

void as a matter of law on grounds that the District Court lacked personal jurisdiction over him

and over New Lots Food.

With respect to Alliance's Section 523(a)(4) claim, Mr. Choez argued, among other

things, that Alliance cannot prove the first element of its claim, that the debt resulted from a

fiduciary defalcation under an express or technical trust.  Specifically, Mr. Choez argued that

Alliance did not produce a copy of Felix Produce's PACA license, and instead, relies only on the

District Court Action for proof that a PACA trust existed.  Mr. Choez argued, as noted above,

that the District Court Judgment is void as a matter of law and even if it is not void, it should not

have collateral estoppel effect here.

By Memorandum Decision and Order dated November 20, 2017, the Court denied Mr.

Choez's motion for summary judgment on his counterclaim, because he did not show that there

is no genuine dispute as to a material fact that the District Court Judgment is void for lack of

personal jurisdiction.  *Choez v. Alliance Shippers, Inc. (In re Choez)*, 2017 WL 5604109, at \*12-

13 (Bankr. E.D.N.Y. Nov. 20, 2017).  The Court also denied Mr. Choez's motion for summary

judgment on Alliance's nondischargeability claim, because similarly, he did not show that there

is no genuine dispute as to a material fact as to any of the three elements of this claim.  *In re*

*Choez*, 2017 WL 5604109, at \*19.  And finally, the Court found that the District Court Judgment

does not have collateral estoppel effect here, because it was entered on default.  *In re Choez*,

2017 WL 5604109, at *16.  That is, the Court concluded that "Alliance cannot establish at least one of the four criteria of federal collateral estoppel, that the question of the existence of a PACA trust was actually litigated and determined in the District Court Action."  *Id*.

On January 25, 2018, Mr. Choez filed a letter requesting that the Court reconsider the summary judgment decision.  On March 1, 2018, Mr. Choez filed a motion to reconsider the order denying the motion for summary judgment and a memorandum of law and affidavit in support on grounds, among others, that newly discovered evidence showed that Felix Produce did not have a PACA license at the time of the relevant transactions.

And by order dated May 3, 2018, the Court denied the motion to reconsider on grounds, among others, that Mr. Choez did not establish that the "newly discovered evidence" was not available upon the exercise of reasonable diligence at the time that the summary judgment motion was made.

## The Trial

On July 16 and 17, 2018, the Court held a trial on the amended complaint and the counterclaim.  At trial, Alliance offered the testimony of Edward Wright and Mr. Choez, and introduced and admitted into evidence Plaintiff's Exhibits A, A1, A2, A3, A4, A6, and B.  Mr. Choez offered his own testimony and introduced and admitted into evidence Defendant's Exhibits A, B, and C.

At trial, Alliance also offered Plaintiff's Exhibits C, D, D1, D2, D3, D4, and D5, which are pleadings and other documents from the record of the District Court Action.  Mr. Choez objected to these exhibits, on grounds that Alliance did not establish a proper foundation for their admission, and alternatively, that they were impermissible hearsay and not appropriate subjects for judicial notice of the truth of the matters asserted therein.

On July 17, 2018, Mr. Choez filed a letter setting forth his objections to these exhibits. On July 18, 2018, this Court directed Mr. Choez to file a brief in support of his objections and scheduled a hearing for August 13, 2018.  On July 25, 2018, Mr. Choez filed a brief in support of his objections, and on August 3, 2018, Alliance filed a response.

On August 13, 2018, the Court held a hearing on Mr. Choez's objections, at which Alliance and Mr. Choez, each by counsel, appeared and were heard.  By order dated August 17, 2018, the Court held that the Exhibits would be admitted to establish the fact of the District Court Action and related findings, but not for the truth of the matters asserted therein.

On August 20, 2018, Alliance and Mr. Choez filed post-trial briefs, and the record is now closed.

## The Witnesses

### *Edward Wright*

Alliance's first witness was Edward Wright.  Mr. Wright is Vice President of the refrigerated division of Alliance and his duties primarily include the movement and delivery of produce.  Trial Tr. July 16, 2018 ("July 16 Trial Tr."), 16:6-11, 17:2-4, ECF No. 90.  He has worked for the company for eighteen years.  July 16 Trial Tr. 15:14-17.

Mr. Wright testified that Krisp-Pak was a former customer of Alliance, and that Alliance handled produce shipments from the West Coast to Krisp-Pak's produce market in Hunts Point, New York.  July 16 Trial Tr. 17:22-25, 18:1-8.  In particular, he stated:

> Q (Mr. Horowitz):  Okay.  Now what type of services did Alliance render for Krisp-Pak?
> A (Mr. Wright):  We handled produce shipments from the West Coast, the stated [sic] that I mentioned earlier, and we shipped them into the Hunts Point produce market where Krisp-Pak had a – they called them sheds where they do their business at.

July 16 Trial Tr. 18:3-8.

Mr. Wright also testified that when Krisp-Pak went out of business, it "owed Alliance approximately $370,000." July 16 Trial Tr. 18:12-21.  He testified that Alliance eventually recovered a judgment against Krisp-Pak.  July 16 Trial Tr. 21:23-25, 22:1-12.  *See* Pl's Exh. A and Pl's Exh. A1.  And Mr. Wright testified that when Krisp-Pak did not pay its debt to Alliance, he directed Alliance's counsel to seek out vendors who owed money to Krisp-Pak, and Felix Produce was one of those vendors.  July 16 Trial Tr. 31:4-25, 32:1-7.

Mr. Wright testified that he then directed Alliance's counsel to attempt to collect from Felix Produce through court proceedings.  July 16 Trial Tr. 32:8-15.  The proceedings led to a court order directing Felix Produce to pay Alliance.  July 16 Trial Tr. 33:4-25, 34:1-25.  *See* Pl's Exh. A2.  Mr. Wright testified that Felix Produce did not pay Alliance, and that he further instructed counsel to pursue payment from Felix Produce.  This led to a judgment against Felix Produce in favor of Alliance.  July 16 Trial Tr. 35:6-19, 36:5-12.  *See* Pl's Exh. A4.

Mr. Wright testified that when Felix Produce did not satisfy its debt, he directed Alliance's counsel to identify any entities or persons that owed money to Felix Produce.  This led to the identification of New Lots Food and Mr. Choez, and eventually, to a court order directing Mr. Choez to pay Alliance.  July 16 Trial Tr. 37:3-25, 38:1-10.  *See* Pl's Exh. A5.

Mr. Wright testified that when Mr. Choez did not pay Alliance, he directed Alliance's counsel to bring a lawsuit against Mr. Choez and New Lots Food.  July 16 Trial Tr. 38:11-20.  *See* Pl's Exh. A6.  Mr. Wright testified that as a result of that lawsuit, Alliance obtained a judgment against Mr. Choez in the amount of $25,723.  That judgment has not been paid.  July 16 Trial Tr. 42:6-22.  *See* Pl's Exh. B.

Mr. Wright testified that when he learned that Mr. Choez had filed for bankruptcy, he directed Alliance's counsel to determine what caused the debt that Mr. Choez owed to Felix

Produce.  July 16 Trial Tr. 42:23-25, 43:1-5.  The result of this investigation was the recovery of statements and invoices showing that Mr. Choez owed Felix Produce money for purchases of produce.  July 16 Trial Tr. 43:6-14.  *See* Pl's Exh. C and Pl's Exh. D.  Mr. Wright stated:

> Q (Mr. Horowitz):  Did I supply you with any documents other than statements?
> A (Mr. Wright):  You provided us with the statements and also the actual billings
> from Mr. Felix to Mr. Choez.

July 16 Trial Tr. 44:21-24.

Mr. Wright also testified that Alliance had a judgment against Mr. Choez in the amount of $30,549, *see* Pl's Exh. D3, and a judgment against Mr. Choez as well, under the PACA laws and regulations, *see* Pl's Exh. D5.  July 16 Trial Tr. 55:25-56:6.  And he testified that Exhibits C, D, D1, D2, D3, D4, and D5 were obtained by Alliance's counsel as a result of Alliance's lawsuit against Mr. Choez.  July 16 Trial Tr. 58:20-23.

Based on the entire record, this Court finds that Mr. Wright was a credible witness, and that his testimony was consistent with, and supported by, several of the exhibits admitted into evidence.

### *Jerry Choez*

Alliance's second witness was the defendant Jerry Choez.  Mr. Choez testified that he is a co-debtor in this bankruptcy case, and that this is his third bankruptcy filing.  July 16 Trial Tr. 65:24-25, 66:1-11.  He testified that in the last twenty or so years, he has "been involved in" two businesses that dealt in produce.  One of those businesses was New Lots Food, which Mr. Choez owned and operated under the trade name Bravo Supermarket.  July 16 Trial Tr. 66:14-25, 67:1-25.  He also testified that he alone managed the financial affairs of New Lots Food, and that he alone was responsible for purchasing the produce sold at the supermarket.  July 16 Trial Tr. 68:1-

21. And Mr. Choez testified that he determined which produce sellers were paid and how they were paid in the ordinary course of business. July 16 Trial Tr. 69:9-25, 70:1.

Mr. Choez testified that sometimes vendors were paid by company check, and other times vendors were paid in cash. He testified that if he paid a vendor in cash, he would usually have the vendor sign off on the invoice to acknowledge payment. July 16 Trial Tr. 70:2-13. Mr. Choez testified that sometimes Felix Ceballos, the owner of Felix Produce, would sign his name on the invoices provided to New Lots Food, indicating that Felix Produce was paid on delivery. July 16 Trial Tr. 71:9-14. And he testified that he did not have copies of signed invoices from Mr. Ceballos accounting for the approximately $30,000 debt owed to Felix Produce, because Mr. Ceballos was paid cash on delivery. July 16 Trial Tr. 72:1-14.

Mr. Choez also testified that he could not be sure whether the notation "paid" written on copies of certain invoices was written by him or by Mr. Ceballos. July 16 Trial Tr. 76:6-24. When pressed to indicate whether he could find Mr. Ceballos's signature on any of the invoices offered in evidence, Mr. Choez testified that he could not definitively say whether Mr. Ceballos signed those invoices. July 16 Trial Tr. 77:13-25, 78:1-25, 79:1-25, 80:1-4. He testified that the name "Manny" was written at the bottom of one of the invoices, and that he was not sure for whom Manny worked. Mr. Choez also acknowledged that the word "paid" was not written on that invoice, or on a separate invoice that bore a signature at the bottom. July 16 Trial Tr. 80:5-8. And he testified that he could locate only two invoices among those offered in evidence that bore the initials of Mr. Ceballos. July 16 Trial Tr. 81:17-20.

Mr. Choez testified that he believed that Mr. Ceballos did not have a PACA license because he did not state on his invoices that he was a PACA licensee. July 16 Trial Tr. 81:21-25. Mr. Choez also testified that he stated during his deposition that he did not know whether Mr.

Ceballos had a PACA license, and was not concerned with whether he had a license or not.  July 16 Trial Tr. 82:1-17.

Mr. Choez testified that he "didn't have a problem with [Mr. Ceballos]" during the time they did business together and is "at a loss" to understand why Mr. Ceballos brought an action against him.  July 16 Trial Tr. 82:18-24.  He further testified that he did not reach out to Mr. Ceballos when he learned of the lawsuit, because he learned about it several years after it was brought and because he was never advised to contact Mr. Ceballos.  July 16 Trial Tr. 83:7-25, 84:1-25.  Mr. Choez testified that he did not have contact information for Mr. Ceballos, did not ask other vendors for Mr. Ceballos' information, and does not currently know where Mr. Ceballos is located or how to contact him.  July 16 Trial Tr. 85:1-25, 86:1-13.  Mr. Choez also testified that he used the proceeds from the business's produce sales to pay other business expenses, including rent and wages, because he had already paid the vendors cash on delivery for their produce.  July 16 Trial Tr. 86:14-25, 87:1-25, 88:1-15.

Mr. Choez testified that the Bravo Supermarket business failed in October 2008 because the business could not pay its expenses as they became due.  July 16 Trial Tr. 88:18-25, 89:1-11.  He testified that he vacated the premises on the same day that the supermarket failed, and left behind his business equipment and records.  July 16 Trial Tr. 91:2-15.  And Mr. Choez testified that these were later taken over by Krasdale Foods Inc. ("Krasdale"), a secured creditor of the Bravo Supermarket business.  *Id.*  That loan, he testified, was secured by, among other things, the business's equipment, files, and inventory.  Trial Tr. July 17, 2018 ("July 17 Trial Tr.") 15:16-23, ECF No. 88.  Mr. Choez also testified that invoices and statements similar to the invoices and statements contained in Plaintiff's Exhibit C were included among the business records that he left behind.  July 16 Trial Tr. 92:5-12.

When asked if he had been given copies of Plaintiff's Exhibit C – invoices for purchases from Felix Produce with PACA language at the bottom – Mr. Choez testified that he did not receive invoices in that format from Mr. Ceballos. He stated that the invoices included in Plaintiff's Exhibit C did not contain his name or the business name. July 16 Trial Tr. 92:16-25, 93:1-19. And he testified that he did not know if the charges shown on the invoices included in Plaintiff's Exhibit C bearing PACA language matched the amounts noted on the statements listing the produce that was purchased. July 16 Trial Tr. 93:24-25, 94:1-14.

Mr. Choez also testified that the invoices included in Exhibit C that were not marked "paid" and did not have Mr. Ceballos' signature on them, that he did not receive those invoices from Mr. Ceballos, and that some of those invoices did not contain his name or his business' name or address. July 16 Trial Tr. 95:17-25, 96:1-25, 97:1-24. And Mr. Choez testified that he believed that the invoices included in Plaintiff's Exhibit C came from his own business records located in a filing cabinet in the Bravo Supermarket premises, and were provided to Mr. Choez's counsel by Krasdale. July 16 Trial Tr. 98:10-25, 99:1-19.

Alliance continued its examination of Mr. Choez on the second day of trial. Mr. Choez testified that Krasdale made a loan to New Lots Food, which was secured by Bravo Supermarket's equipment, files, and inventory. July 17 Trial Tr. 15:16-23. He testified that when New Lots Food defaulted on the Krasdale loan, Krasdale "took over," and he surrendered the Bravo Supermarket business premises and all of its records to Krasdale. July 17 Trial Tr. 15:24-16:4. He also testified that he does not know what happened to the premises or business records, including any invoices from Felix Produce, after he left. July 17 Trial Tr. 16:3-25-17:25. And Mr. Choez testified that he and New Lots Food did not do business with Alliance. July 17 Trial Tr. 18:15-25.

Mr. Choez testified that he first learned of Mr. Ceballos's lawsuit against him when Alliance brought an action against him to collect that debt.  July 17 Trial Tr. 18:20-25, 19:1-15. He testified that this was the first time that he learned of the claim that he and Krasdale owed Mr. Ceballos approximately $30,000.  July 17 Trial Tr. 19:16-25, 20:1-2.  Mr. Choez also testified that he was not aware that Krasdale settled with Mr. Ceballos.  July 17 Trial Tr. 20:19-21:1.

Mr. Choez testified that Krasdale did not ask him to assist in defending the lawsuit brought by Mr. Ceballos, and that he assumed that was because Krasdale could defend itself using the business records that Krasdale now had in its possession.  July 17 Trial Tr. 21:2-25, 22:1-6.  Mr. Choez also testified that he did not know whether he was required to indemnify Krasdale for any claims that it paid on his behalf.  July 17 Trial Tr. 22:7-25, 23:1-14.

Mr. Choez testified that he was not a PACA licensee at the time he owned and operated the Bravo Supermarket and New Lots Food.  July 17 Trial Tr. 24:5-19.  He also testified that he understood that he could be personally liable for amounts owed to produce suppliers if he took the produce without paying for it, sold the produce, and then did not repay the suppliers of the produce from the proceeds.  July 17 Trial Tr. 25:23-25, 26:1-9.

Mr. Choez was then examined by his attorney, Mr. Beard.  Mr. Choez testified that at the time he did business with Mr. Ceballos, he did not know that Mr. Ceballos was acting on behalf of Felix Produce.  He stated that he first learned of Felix Produce when he received a copy of the New Jersey Superior Court Judgment.  July 17 Trial Tr. 26:23-25, 27:1-14.  Mr. Choez testified that he directed Coran Ober, the law firm that employs Mr. Beard, to investigate further into Felix Produce and the surrounding lawsuits.  He testified that as a result of this investigation, he learned that Felix Produce was a New York corporation.  July 17 Trial Tr. 27:15-25, 28:1-25, 29:1-25, 30:1-14.  *See* Def's Exh. A.

Mr. Choez testified that Felix Produce was incorporated on November 20, 2008, and dissolved on April 25, 2012. July 17 Trial Tr. 31:4-5, 31:16-25, 32:1-11. *See* Def's Exhs. A, B. Mr. Choez testified that during this bankruptcy proceeding, he directed his counsel to investigate whether Felix Produce was the holder of a PACA license, and this led to the production of an application, license, and renewal for PACA license issued by the United States Department of Agriculture to Felix Produce. July 17 Trial Tr. 33:12-25, 34:1-10. *See* Def's Exh. C. Mr. Choez testified that Felix Produce first obtained its PACA license on December 10, 2008. July 17 Trial Tr. 39:24-25, 40:1-2. *See* Def's Exh. C.

On further examination by Alliance, Mr. Choez testified that at the time he did business with Mr. Ceballos, he was more concerned with the quality and price of the produce than with the business forms. July 17 Trial Tr. 40:7-21.

Based on the entire record, this Court finds Mr. Choez to be a credible witness, and that his testimony was consistent with, and supported by, several of the exhibits admitted into evidence.

### The Applicable Legal Standards

*The Elements of a Claim Under Bankruptcy Code Section 523(a)(4)*

Bankruptcy Code Section 523(a)(4) provides that a "discharge under section 727 . . . of this title does not discharge an individual debtor from any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). This "'dischargeability provision has for more than a century been construed narrowly and strictly by the Supreme Court.'" *Owens v. Owens (In re Owens)*, 2005 WL 387258, at *4 (S.D.N.Y. Feb. 17, 2005) (quoting *Schwalbe v. Gans (In re Gans)*, 75 B.R. 474, 488 (Bankr. S.D.N.Y. 1987)), *aff'd*, 155 F. App'x 42 (2d Cir. 2005).

To prevail on a Section 523(a)(4) claim, a plaintiff must establish three elements:

> First, the debt must result from a fiduciary's defalcation under an "express or technical trust" involving the entrusting of money or other property to a fiduciary for the benefit of another.  Second, the debtor must have acted in a fiduciary capacity with respect to the trust.  Third, the transaction in question must be a "defalcation" within the meaning of bankruptcy law.

*Chao v. Duncan (In re Duncan)*, 331 B.R. 70, 77 (Bankr. E.D.N.Y. 2005) (internal citations omitted).  The Second Circuit has held that "[a] creditor seeking to establish nondischargeability under § 523(a) must do so by the preponderance of the evidence."  *Ball v. AO Smith Corp.*, 451 F.3d 66, 69 (2d Cir. 2006) (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

<u>The First Element – the Existence of an Express or Technical Trust.</u>  Under the first element of Section 523(a)(4), "'[a] technical trust is one imposed by statutory or common law and will exist where the statute (1) defines the trust res, (2) identifies the trustee's fiduciary duties, and (3) imposes a trust prior to and without reference to the wrong that created the debt.'" *E. Armata, Inc. v. Parra* (*In re Parra*), 412 B.R. 99, 104 (Bankr. E.D.N.Y. 2009) (quoting *A.J. Rinella & Co. v. Bartlett* (*In re Bartlett*), 397 B.R. 610, 619 (Bankr. D. Mass. 2008)).

"PACA trusts satisfy the requirements for a technical trust."  *In re Parra*, 412 B.R. at 105.  And pursuant to PACA, a trust is created when a sale of perishable agricultural commodities occurs, until the seller is paid:

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499e(c)(2).  Under the statute, PACA trust rights can be preserved by one of two methods, the notice method and the invoice method.

16

_The Notice Method._  Produce sellers preserve their PACA trust rights by giving "written notice of intent to preserve the benefits of the trust" to the merchant within thirty days after expiration of the parties' payment terms.  7 U.S.C. § 499e(c)(3).  "The written notice to the commission merchant, dealer, or broker shall set forth information in sufficient detail to identify the transaction subject to the trust."  _Id_.  This written notice may be separate from the invoice that a seller may provide at the time of the transaction.  _Id_.  In addition to the written notice of intent to preserve the benefits of the trust, this written notice must include, among other information, the names and addresses of the seller and the buyer, the transaction date, the commodity that is the subject of the transaction, the invoice price and payment terms, and the amount past due and unpaid.

The requirements for the "notice of intent to preserve trust benefits" are identified with particularity in the Code of Federal Regulations, as follows:

> (1)     Notice of intent to preserve benefits under the trust must be in writing, must include the statement that it is a notice of intent to preserve trust benefits and must include information which establishes for each shipment:
>> (i)      The names and addresses of the trust beneficiary, seller-supplier, commission merchant, or agent and the debtor, as applicable,
>> (ii)     The date of the transaction, commodity, invoice price, and terms of payment (if appropriate),
>> (iii)    The date of receipt of notice that a payment instrument has been dishonored (if appropriate), and
>> (iv)    The amount past due and unpaid; except that if a supplier, seller or agent engages a commission merchant or growers' agent to sell or market their produce, the supplier, seller or agent that has not received a final accounting from the commission merchant or growers' agent shall only be required to provide information in sufficient detail to identify the transaction subject to the trust.

7 C.F.R. § 46.46(f)(1).

One bankruptcy court has observed that, in the context of the Notice Method, "courts are split on whether compliance with the notice requirements of PACA must be strict or merely substantial." *In re Superior Tomato-Avocado, Ltd.*, 481 B.R. 866, 870 (Bankr. W.D. Tex. 2012). That court held:

> [T]he notice requirements need only be substantially complied with, in order to effectuate Congressional intent and harmonize the interplay of PACA and the Bankruptcy Court. Even though A & A was not a licensee, it substantially followed a set [of] guidelines set forth by the PACA, providing Superior general notice that A & A may bring a PACA trust claim. The clear statement regarding intent, coupled with attaching the specific invoices with respect to which it claimed a trust, is sufficient to meet the requirements set out in section 499e(c)(3).

*In re Superior Tomato-Avocado, Ltd.*, 481 B.R. at 873. And it concluded that "[t]he weight of authority as well as the current trend in the case law both tip in favor of substantial compliance." *In re Superior Tomato-Avocado, Ltd.*, 481 B.R. at 870.

Courts in this District have likewise held that under PACA, and in particular its implementing regulations, perfect compliance is not the test, and substantial compliance with the regulatory notice requirements is enough. For example, one court found that the identification of a business as "S & S" rather than "Sweet & Savory," and listing the incorrect address, did not invalidate the plaintiff's attempt to preserve a PACA trust. *Food Authority, Inc. v. Sweet & Savory Fine Foods, Inc.*, 2011 WL 477714, at *3 (E.D.N.Y. Feb. 4, 2011).

*The Invoice Method.* Alternatively, a licensed PACA produce seller may preserve its PACA trust rights by including language required by PACA on its invoice to notify the buyer that the produce is sold subject to the PACA trust. 7 U.S.C. § 499e(c)(4). Notably, this path is available only to a produce seller that is a holder of a PACA license. As the PACA statute states:

> In addition to the method of preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust. The bill or invoice statement must include the information required by the last sentence of paragraph

(3) and contain on the face of the statement the following:  "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)).  The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received."

7 U.S.C. § 499e(c)(4).

As one court has explained:

Proper notice under the invoice method consists of three independent requirements.  *See Chang,* 385 F. Supp. 2d at 361.  First, the bills or invoices must be "ordinary and usual," meaning they are "communications customarily used between parties to a transaction in perishable agricultural commodities in whatever form, documentary or electronic, for billing or invoicing purposes."  7 U.S.C. § 499e(c)(4); 7 C.F.R. § 46.46(5).  Second, the payment period must appear on the bill or invoice if it differs from the default payment period established by the regulations.  7 U.S.C. § 499e(c)(4).  Finally, the bill or invoice must give notice on its face that the perishable agricultural commodities are covered by the PACA's statutory trust requirement, and do so using the precise language provided in the Act.  *See* 7 U.S.C. § 499e(c)(4).

*New Son Yeng Produce N.Y. LLC v. New A & N Food Mkt., Inc.,* 2014 WL 3725874, at *5

(E.D.N.Y. July 25, 2014).

The Second Element – Acting in a Fiduciary Capacity with Respect to the Trust.  Under

the second element of a Section 523(a)(4) claim, the term "fiduciary capacity" is narrowly

construed, to encompass only those relationships arising out of express or technical trusts, or

statutorily imposed trusts.  4 *Collier on Bankruptcy* ¶ 523.10[1][d] (Richard Levin, Alan N.

Resnick & Henry J. Sommer eds., 16th ed.).  It does not extend to constructive, implied, or

resulting trusts.  *Id.*

The Third Element – Committing a Fiduciary Defalcation with Respect to the Trust.  As

to the third element of Section 523(a)(4), the Supreme Court has interpreted "defalcation" to

require "a culpable state of mind requirement akin to that which accompanies application of the

other terms in the same statutory phrase" such as fraud, embezzlement, and larceny. *Bullock v. BankChampaign, N.A.*, 569 U.S. 267, 269 (2013). This is a high standard, and for this element to be established, the Supreme Court has specified that the fiduciary must have acted with actual knowledge, with "willful[] blind[ness]," or with "bad faith, moral turpitude, or other immoral conduct." *Bullock*, 569 U.S. at 273-74. The Supreme Court rejected the notion that a lower threshold for "defalcation" should apply, noting that such a definition would capture "'even innocent acts of failure to fully account for money received in trust,'" and would not be appropriate here. *Bullock*, 569 U.S. at 271 (quoting *Sherman v. SEC (In re Sherman)*, 658 F.3d 1009, 1017 (9th Cir. 2011)).

To similar effect, the Second Circuit has held that "defalcation under [Bankruptcy Code Section] 523(a)(4) requires a showing of conscious misbehavior or extreme recklessness – a showing akin to the showing required for scienter in the securities law context." *Denton v. Hyman (In re Hyman)*, 502 F.3d 61, 68 (2d Cir. 2007). *Accord Rahman v. Seung Min Park (In re Seung Min Park)*, 2011 WL 1344495, at *4 (Bankr. E.D.N.Y. Apr. 8, 2011) (same).

*Relief from Judgment*

Under Federal Rule of Civil Procedure 60(b)(4), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 9024, "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" if "the judgment is void." Fed. R. Civ. P. 60(b)(4).

As the Second Circuit has noted, "[s]ince [Rule] 60(b) allows extraordinary judicial relief, it is invoked only upon a showing of exceptional circumstances." *Nemaizer v. Baker*, 793 F.2d 58, 61 (2d Cir. 1986). Rule 60(b) is strictly applied, following the tenet that "[a] court's final judgment should not 'be lightly reopened.'" *Herschaft v. N.Y.C. Campaign Fin. Bd.*, 139 F.

Supp. 2d 282, 286 (E.D.N.Y. 2001) (quoting *Nemaizer*, 793 F.2d at 61). Rule 60(b) does not

designate a forum "for presenting a motion for relief from judgment, [but] the motion is

generally brought in the district court rendering judgment." *Covington Indus., Inc. v. Resintex*

*A.G.*, 629 F.2d 730, 733 (2d Cir. 1980) (citing 7 James Wm. Moore et al., *Moore's Federal*

*Practice* ¶ 60.28(1) (2d ed. 1979)).

In limited circumstances, a district court may entertain a collateral attack on another

district court's judgment. "Although the case law is somewhat meager, precedent exists

supporting the proposition that Rule 60(b)(4) may be invoked in the registration court to obtain

relief from a foreign default judgment attacked as void for lack of personal jurisdiction over the

parties against whom it was rendered." *Covington Indus.*, 629 F.2d at 734 (describing a district

court in the Southern District of New York voiding a judgment of a district court in the Central

District of California).

The concept of a void judgment is narrowly construed. A judgment is void, and subject

to relief under Rule 60(b)(4), "only in the rare instance where a judgment is premised either on a

certain type of jurisdictional error or on a violation of due process that deprives a party of notice

or the opportunity to be heard." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 271

(2010). For example, a judgment may be void if the rendering court lacked the power to exercise

personal jurisdiction over the defendant. *See* 12 James Wm. Moore et al., *Moore's Federal*

*Practice* ¶ 60.44 (3d ed. 2017).

A judgment may also be void if the rendering court had the power to exercise personal

jurisdiction over the defendant, but the defendant was not properly served. *Id.* A certificate or

affidavit of service is evidence that a defendant was properly served. "[A] properly filed

affidavit of service by a plaintiff is *prima facie* evidence that service was properly effected." *Ahluwalia v. St. George's Univ., LLC*, 63 F. Supp. 3d 251, 260 (E.D.N.Y. 2014).

A defendant can "rebut[] the presumption of proper service" with a "sworn denial of receipt of service." *Old Republic Ins. Co. v. Pacifica Fin. Servs. of Am., Inc.*, 301 F.3d 54, 57 (2d Cir. 2002). The defendant himself must swear to "'specific facts to rebut the statements in the process server's affidavits.'" *Old Republic Ins. Co.*, 301 F.3d at 58 (quoting *Simonds v. Grobman*, 716 N.Y.S.2d 692, 693 (App. Div. 2d Dep't 2000)).

## Discussion

### *Alliance's Section 523(a)(4) Claim*

Bankruptcy Code Section 523(a)(4) provides that a debt is nondischargeable if it is the result of the debtor's fraud or defalcation while acting in a fiduciary capacity. Accordingly, to prevail after trial on this claim, Alliance must establish three elements. First, Alliance must show that the debt at issue arose in connection with an express or technical trust involving the entrusting of money or other property to a fiduciary for the benefit of another, here a PACA trust. Second, Alliance must show that Mr. Choez acted in a fiduciary capacity with respect to that trust. And third, Alliance must show that the circumstances at issue amounted to a "defalcation" within the meaning of bankruptcy law.

Alliance also seeks an award of counsel fees and costs of suit.

### *Whether Alliance Has Shown that the Debt at Issue Arose in Connection with an Express or Technical Trust*

The first element of Alliance's Section 523(a)(4) claim is that the debt at issue arose in connection with an "express or technical trust," here, a PACA trust, involving the entrusting of money or other property to a fiduciary for the benefit of another. *In re Duncan*, 331 B.R. at 77.

That is, Alliance must show, by a preponderance of the evidence, that a PACA trust existed and was preserved at the time of the transactions at issue.

As described above, there are two ways to preserve a PACA trust: by giving written notice of intent to preserve trust benefits, or the Notice Method, and for a PACA licensee only, the Invoice Method. Alliance must show that one of these paths was followed in order to prevail on this claim.

<u>The Notice Method.</u> As described above, the Code of Federal Regulations provides that the written notice of intent to preserve trust benefits must meet the following requirements, and contain the following information:

> (1)    Notice of intent to preserve benefits under the trust must be in writing, must include the statement that it is a notice of intent to preserve trust benefits and must include information which establishes for each shipment:
>
>     (i)    The names and addresses of the trust beneficiary, seller-supplier, commission merchant, or agent and the debtor, as applicable,
>
>     (ii)    The date of the transaction, commodity, invoice price, and terms of payment (if appropriate),
>
>     (iii)    The date of receipt of notice that a payment instrument has been dishonored (if appropriate), and
>
>     (iv)    The amount past due and unpaid; except that if a supplier, seller or agent engages a commission merchant or growers' agent to sell or market their produce, the supplier, seller or agent that has not received a final accounting from the commission merchant or growers' agent shall only be required to provide information in sufficient detail to identify the transaction subject to the trust.

7 C.F.R. § 46.46(f)(1). This Court agrees with the weight of authority that substantial compliance with each of the requirements of the Notice Method is sufficient to preserve a PACA trust. That is, while each and all of the notice requirements must be satisfied in substance, a modest variation in the required information, such as using an initial for a portion of a party's name, will not annul a notice that otherwise meets the requirements of the statute.

Alliance argues, in substance, that Felix Produce preserved a PACA trust by delivering invoices and statements to Mr. Choez that contained the necessary statutory language as required by PACA.  Pl's Post Trial Br. at 5.

First, Alliance argues that the evidence shows that the debt owed by Mr. Choez and New Lots Food to Felix Produce, an account debtor of Krisp-Pak, was assumed by Alliance in satisfaction of a debt that Krisp-Pak owed to Alliance.

As described above, Alliance's Vice President Mr. Wright testified that Krisp-Pak, a former customer of Alliance, went out of business and "owed Alliance approximately $370,000." July 16 Trial Tr. 18:12-21.  Alliance eventually recovered a judgment against Krisp-Pak.  July 16 Trial Tr. 21:23-25, 22:1-12.  *See* Pl's Exh. A and Pl's Exh. A1.  And when that judgment was not paid, Alliance sought to collect from vendors who owed money to Krisp-Pak, and Felix Produce was one of those vendors.  July 16 Trial Tr. 31:4-25, 32:1-7.

Alliance succeeded in obtaining a court order directing Felix Produce to pay Alliance. July 16 Trial Tr. 33:4-25, 34:1-25.  *See* Pl's Exh. A2.  This led to a judgment against Felix Produce in favor of Alliance.  July 16 Trial Tr. 35:6-19, 36:4-15.  *See* Pl's Exh. A4.  But again, that judgment was not paid, and Alliance sought to collect from entities or persons who owed money to Felix Produce, and that led to the identification of New Lots Food and Mr. Choez.

And again, Alliance succeeded in obtaining a court order directing Mr. Choez to pay Alliance.  July 16 Trial Tr. 37:3-25, 38:1-20.  *See* Pl's Exh. A5.  Alliance brought an action against Mr. Choez and New Lots Food.  July 16 Trial Tr. 38:16-20.  *See* Pl's Exh. A6.  As a result of that lawsuit, Alliance obtained a judgment against Mr. Choez in the amount of $25,723, which remains unpaid.  July 16 Trial Tr. 42:6-22.  *See* Pl's Exh. B.

Second, Alliance argues that the evidence establishes the existence of a PACA trust between Felix Produce and New Lots Food.

Alliance argues that the evidence shows that Felix Produce complied with the requirements of PACA to preserve a PACA trust. Specifically, Alliance points to evidence in the form of invoices and statements that contain the following language:

> "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust, authorized by Section 5(c) of the Perishable Agricultural Commodities Act. 1930 (7 U.S.C. 499(e)(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities and any receivables or proceeds from the sale of these commodities until full payment is received. In the event of the enforcement of our trust claim, we will seek to recover reasonable attorney's fees and the costs of recovery."

Pl's Exhs. C, D, and D1. Notably, this is the language set forth in PACA for purposes of preserving a PACA trust by the Invoice Method, and that method is available only to a produce seller that is a holder of a PACA license.

Alliance also argues that Mr. Choez did not come forward with evidence disputing the validity or accuracy of the invoices and statements. Alliance notes that Mr. Choez did not introduce evidence of payment, such as paid receipts signed by Felix Produce, or invoices or statements containing different PACA language or no PACA language at all. As Mr. Choez testified:

> Q (Mr. Horowitz): Do you have any actual invoices from Felix which makes up the $30,000 claim that he signed his name or New Lots – or excuse me, his company's name that you paid him?
> A (Mr. Choez): No, he didn't have to.

July 16 Trial Tr. 72:1-4.

And Alliance points to testimony that Mr. Choez was not sure as to whether the notation "paid" on invoices was written by him or Mr. Ceballos. July 16 Trial Tr. 76:6-24. In particular,

25

Alliance argues that Mr. Choez was not able to state definitively whether he could find Mr. Ceballos's signature on any of the invoices in front of him, except for two invoices.  July 16 Trial Tr. 77:13-81:20.

In conclusion, Alliance argues that Felix Produce's statements with respect to its intent, including as set forth in its invoices, show that Felix Produce substantially complied with PACA's notice requirements, and therefore, preserved a PACA trust.

Mr. Choez responds first by noting that Alliance failed to plead in its amended complaint that a PACA trust was preserved using the Notice Method.  He argues that even if Alliance had alleged that a PACA trust was preserved by this method, Alliance has not shown that the requirements to preserve a PACA trust were met.  And Mr. Choez argues that the Second Circuit requires strict compliance, not substantial compliance, with the Notice Method to preserve a PACA trust.

Mr. Choez also argues that Alliance did not introduce testimony or other evidence to show that written notice of intent to preserve trust benefits was given to Mr. Choez by Felix Produce, as required by the Notice Method of preserving a PACA trust.  Rather, Mr. Choez testified that he did not receive invoices bearing PACA language from Mr. Ceballos, and also testified that the specific invoices he was shown did not contain his name or the name of his business.  July 16 Trial Tr. 92:19-25, 93:1-19.  For these reasons, Mr. Choez argues that Alliance failed to prove the existence of a PACA trust by the Notice Method.

Here, the record shows that Alliance has met its burden to establish that the debt owed by Mr. Choez and New Lots Food to Felix Produce, an account debtor of Krisp-Pak, was assumed by Alliance in satisfaction of a debt that Krisp-Pak owed to Alliance.

But the record also shows that Alliance has not met its burden to establish that a PACA trust was preserved in favor of Felix Produce pursuant to the Notice Method. To be sure, the record contains some evidence that Felix Produce intended to preserve a PACA trust. This evidence includes invoices that bear the particular language set forth in PACA for use by PACA license holders to preserve their trust rights by the Invoice Method. But that language is only one portion of the notice procedure that is required under the Notice Method, and here, Alliance has not met its burden to establish that Felix Produce substantially complied with each of the requirements of the Notice Method to preserve a PACA trust.

Specifically, Alliance did not provide invoices or documents sent by Felix Produce to New Lots Food containing a "statement that it is a notice of intent to preserve trust benefits." 7 C.F.R. 46.46(f)(1). And Alliance did not provide testimony at trial by Mr. Ceballos, or any other employee of Felix Produce, that Mr. Ceballos communicated his intent to preserve a PACA trust to Mr. Choez. In addition, Alliance did not provide written notices or documents that set forth, among other necessary information, the address of the seller, the name and address of the buyer, a clearly defined transaction date, the commodity that is the subject of the transaction, the invoice price and payment terms, and the amount past due and unpaid, as required by the statute to satisfy the Notice Method requirements. Instead, the PACA language found on the invoices is the language necessary to preserve a trust under the Invoice Method, and requires the PACA seller to have a PACA license.

This does not satisfy the requirement that a produce seller preserve its PACA trust rights by giving "written notice of intent to preserve the benefits of the trust" to the merchant within thirty days after expiration of the parties' payment terms. 7 U.S.C. § 499e(c)(3). Nor does it meet the requirement that "[t]he written notice to the commission merchant, dealer, or broker

shall set forth information in sufficient detail to identify the transaction subject to the trust." 7

U.S.C. § 499e(c)(3). And it does not amount to substantial compliance with those requirements,

either.

Indeed, if the use of the Invoice Method language on an invoice was sufficient to satisfy

the requirements of the Notice Method, then it is difficult to see what purpose would be served

by the two means to preserve the benefits of a PACA trust, or why it would be desirable for a

produce seller to have a PACA license.

The Invoice Method. PACA provides that a licensed PACA produce seller may preserve

its PACA trust rights by including specified language on its invoice to notify the buyer that the

produce is sold subject to the protections of a PACA trust. 7 U.S.C. § 499e(c)(4). As noted

above, the required language is as follows:

> "The perishable agricultural commodities listed on this invoice are sold subject to
> the statutory trust authorized by section 5(c) of the Perishable Agricultural
> Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities
> retains a trust claim over these commodities, all inventories of food or other
> products derived from these commodities, and any receivables or proceeds from
> the sale of these commodities until full payment is received."

7 U.S.C. § 499e(c)(4).

Significantly, and as also noted above, the Invoice Method of preserving PACA trust

rights is available only to a produce seller that is a holder of a PACA license. 7 U.S.C.

§ 499e(c)(4).

In the amended complaint, Alliance alleges that a PACA trust was established and

preserved pursuant to the Invoice Method. As the amended complaint states:

> On each of the outstanding invoices sent by the Plaintiff's judgment debtor to
> New Lots, the Plaintiff's judgment debtor, as a PACA licensee, placed the exact
> language statutorily prescribed by PACA to be placed on all invoices by a
> licensee to notify the buyer that a seller/supplier of perishable agricultural
> commodities is preserving its rights as a beneficiary to the statutory trust pursuant

to 7 U.S.C. Sec. 499e(c)(4), plus pre and post judgment interest and attorneys' fees.

Am. Compl. ¶ 17.

But at trial, Alliance did not argue or offer evidence to show that Felix Produce was a licensed PACA seller at the time it did business with New Lots Food. And Alliance acknowledges that "Felix did not become a PACA licensee until between its sales to the debtor and its District Court action against the debtor," that is, after the transactions at issue. Pl's Post Trial Br. at 12.

Mr. Choez argues that Alliance may not rely on the Invoice Method because the evidence shows that Felix Produce did not have a PACA license at the time that it did business with Mr. Choez. Specifically, he argues that the evidence shows that the transactions at issue took place between April 2008 and September 2008, and that Felix Produce did not obtain a PACA license until December 10, 2008. July 17 Trial Tr. 39:24-25, 40:1; Def's Exh. C.

Mr. Choez also notes that this evidence came to light while this adversary proceeding was pending. He points to his testimony showing that during the course of this action, he directed his counsel to investigate whether Felix Produce was the holder of a PACA license. This inquiry led to the production of an application, license, and renewal for a PACA license issued by the United States Department of Agriculture to Felix Produce. July 17 Trial Tr. 33:12-25, 34:1-10. *See* Def's Exh. C. And as those documents confirm, Felix Produce first obtained a PACA license on December 10, 2008. As Mr. Choez testified:

> Q (Mr. Beard): Mr. Choez, when did Felix Produce Corp first obtain a [PACA] license?
> A (Mr. Choez): [Exhibit C] says December 10th, 2008.

July 17 Trial Tr. 39:24-25, 40:1.

Here, the record shows that Alliance has not met its burden to establish that a PACA trust was preserved in favor of Felix Produce pursuant to the Invoice Method. Here again, and to be sure, the record contains evidence that Felix Produce complied with some of the requirements of the Invoice Method. Alliance has come forward with evidence that Felix Produce included the specific language required by PACA to preserve a PACA trust on its invoices. The invoices state:

> "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act. 1930 (7 U.S.C. 499(e)(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received. In the event of the enforcement of our trust claim, we will seek to recover reasonable attorney's fees and the costs of recovery."

Pl's Exh. C.

But just as it is clear that the evidence establishes that the Invoice Method language was included on Felix Produce's invoices, it is also clear that the evidence demonstrates that Felix Produce did not have a PACA license at the time it did business with New Lots Food and Mr. Choez. *See* Def's Exh. C. As a consequence, Felix Produce was not able to use the Invoice Method to preserve its PACA trust rights, because PACA provides that "*a licensee* may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust" – and Felix Produce was not a PACA licensee. *See* 7 U.S.C. § 499e(c)(4) (emphasis added).

*           *           *

In sum, the record shows that Alliance has met its burden to establish that the debt owed by Mr. Choez and New Lots Food to Felix Produce was assumed by Alliance. But the record also shows that Alliance has not met its burden to establish that a PACA trust was preserved in

favor of Felix Produce pursuant to the Notice Method because, among other reasons, Alliance has not met its burden to establish that Felix Produce substantially complied with each of the requirements of the Notice Method to preserve a PACA trust. And similarly, the record shows that Alliance has not met its burden to establish that a PACA trust was preserved in favor of Felix Produce pursuant to the Invoice Method because, among other reasons, Felix Produce did not have a PACA license at the time it did business with New Lots Food and Mr. Choez, and as a consequence, it could not rely on the Invoice Method to preserve its PACA trust rights.

For these reasons, and based on the entire record, Alliance has not proved, by a preponderance of the evidence, the first element of its Section 523(a)(4) claim, that the debt at issue arose in connection with an express or technical trust.

### *Whether Alliance Has Shown that Mr. Choez Acted in a Fiduciary Capacity with Respect to the Trust*

The second element of Alliance's Section 523(a)(4) claim is that Mr. Choez "acted in a fiduciary capacity with respect to the trust." *In re Duncan*, 331 B.R. at 77 (citations omitted). That is, Alliance must show, by a preponderance of the evidence, that Mr. Choez acted in a fiduciary capacity with respect to a PACA trust.

For purposes of a nondischargeability claim under Section 523(a)(4), the term "fiduciary capacity" is narrowly construed to include only relationships arising out of express or technical trusts, or statutorily imposed trusts. It does not extend to constructive, implied, or resulting trusts. As noted above, a PACA trust is a "technical trust" for the purposes of Section 523(a)(4).

Alliance argues that Mr. Choez acted in a fiduciary relationship with respect to a PACA trust. Alliance argues that Mr. Choez acknowledged that he was the sole officer, owner, and shareholder of New Lots Food, that he possessed the sole authority to write checks on behalf of New Lots Food, and that he was responsible for distributing sales proceeds.

Here, the record shows that Mr. Choez was the sole officer of New Lots Food and was responsible for operating the Bravo Supermarket business.  Mr. Choez testified that he owned New Lots Food:

> Q (Mr. Horowitz):  Okay.  And then thereafter you decided to move back to New York and back maybe 10 years ago, thereabouts, you and you alone started a business or company rather called New Lots Food Corp; right?
> A (Mr. Choez): Yes.
> Q: Okay.  And you attached the trade name to it as Bravo Supermarket?
> A: Yes.
> Q: Okay.  And this business or this company and the business was solely owned by you?
> A: Yes.

July 16 Trial Tr. 67:10-20.

Mr. Choez also testified that he was in charge of managing the financial affairs of New Lots Food:

> Q (Mr. Horowitz):  The business – we'll call it Bravo business or Bravo for – business for short, you were the only one who could sign checks?
> A (Mr. Choez):  Yes.
> Q:  Okay.  And you were the only one who went to the bank to make deposits and withdrawals; right?
> A:  Yes.

July 16 Trial Tr. 68:1-9.

But here, and as described above, the record also shows that Alliance did not establish that a PACA trust was preserved with respect to the debt at issue.  And the term "fiduciary capacity" is narrowly construed to include only relationships arising from express or technical trusts, or statutorily imposed trusts.

For these reasons, and based on the entire record, Alliance has not proved, by a preponderance of the evidence, the second element of its Section 523(a)(4) claim, that Mr. Choez was acting in a fiduciary capacity with respect to an express or technical trust.

_Whether Alliance Has Shown that Mr. Choez Committed a Fiduciary Defalcation with Respect to the Trust_

The third element of Alliance's Section 523(a)(4) claim is that Mr. Choez committed a fiduciary defalcation with respect to the debt at issue.  *See In re Duncan*, 331 B.R. at 77.  That is, Alliance must show, by a preponderance of the evidence, that Mr. Choez committed a defalcation as a fiduciary within the meaning of Section 523(a)(4).

As described above, not every loss compels the conclusion that a fiduciary defalcation has occurred.  Rather, for conduct to amount to a fiduciary defalcation, the Supreme Court has specified that the fiduciary must have acted with actual knowledge, with "willful[] blind[ness]," or with "bad faith, moral turpitude, or other immoral conduct."  *Bullock*, 569 U.S. at 267-68.  To similar effect, the Second Circuit has held that "defalcation under [Bankruptcy Code Section] 523(a)(4) requires a showing of conscious misbehavior or extreme recklessness – a showing akin to the showing required for scienter in the securities law context."  *In re Hyman*, 502 F.3d at 68 (citations omitted).

Alliance argues that Mr. Choez committed a defalcation with respect to a PACA trust.  It points to Mr. Choez's testimony that he was the sole manager, decision-maker, and bookkeeper of New Lots Food.  Alliance also argues that this Court should infer that Mr. Choez was familiar with the requirements of PACA based on his experience in the produce and supermarket industry and his response to Felix Produce's PACA trust claim.  Pl's Post Trial Br. at 14-15.  And Alliance argues that Mr. Choez violated his fiduciary obligations under PACA by knowingly paying business expenses from sales proceeds, rather than holding those funds in trust for Felix Produce.

Mr. Choez responds that Alliance has not shown that he committed a fiduciary defalcation under Section 523(a)(4).  Rather, Mr. Choez states, his testimony demonstrates that

Felix Produce was immediately paid cash upon delivery by New Lots Food.  Mr. Choez also responds that he faced several obstacles following the opening of New Lots Food, including a delay in its receipt of a license to accept Women Infant and Children benefits, and that this led to lower revenues and eventually, to the default on the Krasdale loan and on payments to other creditors.

And Mr. Choez argues that as a result of the default on the Krasdale loan, he surrendered the Bravo Supermarket business premises and all of its records in October 2008.  He responds that Alliance has not come forward with persuasive or credible evidence to show that he had the requisite intent to commit wrongdoing, or that he was extremely reckless in his behavior.  And Mr. Choez points out that there was no alternate testimony provided at trial to discredit his testimony.

Here, the record includes conflicting evidence as to how Mr. Ceballos and Felix Produce were paid, and whether Mr. Choez knew that Felix Produce was attempting to preserve a PACA trust.  For example, Mr. Choez testified that he paid Mr. Ceballos cash on delivery.  Specifically, he stated:

> Q (Mr. Horowitz):  Do you have any actual invoices from Felix which makes up the $30,000 claim that he signed his name or New Lots – or, excuse me, his company's name that you paid him?
> A (Mr. Choez):  No, he didn't have to.
> Q:  He didn't have to, because you didn't require him to.
> A:  Because he wouldn't have left the produce if I wouldn't have paid him.  It was a COD account.

July 16 Trial Tr. 72:1-7.

The record also includes evidence in the form of invoices and statements bearing PACA notice language that is consistent with Alliance's argument that Felix Produce was attempting to

preserve a PACA trust.  As noted above, that language is identical to the form of notice required to preserve a PACA trust under the Invoice Method.

And the record includes Mr. Choez's testimony that he was responsible for paying suppliers and other business expenses.  This establishes that Mr. Choez was the individual responsible for the operations of Bravo Supermarket, and was aware that if he and Bravo did not pay its produce suppliers, that that could lead to personal liability for him.  He testified:

> Q (Mr. Horowitz):  Okay, so you understood during the time that you operated Bravos that if you bought produce, and I'm going to use that example – that commodity because that's what's at issue in this case, that you bought produce and you didn't pay the supplier for it, but then you went out and resold the produce to your customers, if you didn't take the money from the customers and give it to the – or pay the produce supplier, that you would be personally liable. Could be personally liable, excuse me.
> A (Mr. Choez):  Did I have that understanding?
> Q:  Yes.
> A:  Yes.

July 17 Trial Tr. 25:23-25. 26:1-9.

The burden is on Alliance to prove by a preponderance of the evidence that Mr. Choez acted with actual knowledge, "willful[] blind[ness]," or "bad faith, moral turpitude, or other immoral conduct," and did so as a fiduciary of an express or technical trust, with respect to the debt at issue.  *Bullock*, 569 U.S. at 267-68.  This element of intent is a significant component of liability under Section 523(a)(4), and as noted, the Second Circuit has explained that "defalcation under [Bankruptcy Code Section] 523(a)(4) requires a showing of conscious misbehavior or extreme recklessness."  *Hyman*, 502 F.3d at 68.  And here, as it was in the motion for summary judgment, the record falls short.  While Alliance has demonstrated that Mr. Choez was knowledgeable about the grocery business and the obligations that accompany the purchase of perishable agricultural commodities – here, produce – Alliance has not shown by a

preponderance of the evidence that Mr. Choez acted with the kind of willful misconduct that is necessary to a fiduciary defalcation.

In addition, as the Court has already found, Alliance has not shown by a preponderance of the evidence that a PACA trust was in existence at the time Mr. Choez was doing business with Felix Produce, or that Mr. Choez was acting in a fiduciary capacity with respect to such a trust.

For these reasons, and based on the entire record, Alliance has not proved, by a preponderance of the evidence, the third element of its Section 523(a)(4) claim, that the debt at issue arose from misconduct by Mr. Choez that constituted a "defalcation" within the meaning of bankruptcy law.

### *Whether Alliance Has Shown that It Is Entitled To Recover Counsel Fees and Costs of Suit*

Alliance seeks an award of counsel fees and costs of suit.  Courts have found that where PACA trust rights have been preserved, these rights may extend to the recovery of contractual fees and costs.  As one court stated, "[u]nder PACA, a party can recover costs other than amounts due for produce 'that are due contractually or otherwise "in connection with" the transaction that is the subject of the PACA trust claim." *Spectrum Produce Distrib., Inc. v. Fresh Mktg., Inc.*, 2012 WL 2369367, at *2 (D.N.J. June 20, 2012) (internal citations omitted). These costs and expenses "include attorney fees and interest that buyers and sellers have bargained for in their contracts." *Id.* (quotations and citations omitted).

Alliance points to language in the invoices and statements of Felix Produce that states: "In the event of the enforcement of our trust claims, we will seek to recover reasonable attorney's fees and the costs of recovery."  Pl's Post Trial Br. at 15.

Here, the Court has found that Alliance has not proved, by a preponderance of the evidence, that a PACA trust existed, that Mr. Choez acted in a fiduciary capacity with respect to such a trust, or that the debt at issue arose out of a defalcation. For these same reasons, Alliance cannot recover its counsel fees and costs of suit because it did not prevail on its Section 523(a)(4) claim.

For these reasons, and based on the entire record, Alliance has not proved, by a preponderance of the evidence, that it is entitled to recover its counsel fees and costs of suit.

### *Mr. Choez's Counterclaim*

A judgment is void "only in the rare instance where [it] is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." *United Student Aid Funds*, 559 U.S. at 271 (citations omitted). A judgment may also be void if the rendering court had the power to exercise personal jurisdiction over the defendant, but the defendant was not properly served. *See* 12 James Wm. Moore et al., *Moore's Federal Practice* ¶ 60.44 (3d ed. 2017).

Accordingly, to prevail on his counterclaim, Mr. Choez must show that this Court has the authority to void the District Court Judgment, and that grounds to void that judgment exist because he was not properly served in the District Court Action.

### *Whether Mr. Choez Has Shown that He Is Entitled to a Declaratory Judgment Voiding the District Court Action for Lack of Personal Jurisdiction*

In his counterclaim, Mr. Choez alleges that he was not served with the summons and complaint in the District Court Action and, as a result, that the District Court did not have a basis to exercise personal jurisdiction over him.

Mr. Choez testified that he did not receive notice of the District Court Action.  July 17

Trial Tr. 19:1-6, 19:10-15.  He also testified that he left the Bravo Supermarket business

premises in October 2008, and did not return.  July 17 Trial Tr. 16:19-21.

Mr. Choez has sought this relief before.  In this Court's decision on Mr. Choez's motion

for summary judgment, the Court stated:

> As a threshold matter, the Court must determine whether this is the proper forum
> to consider a claim that seeks to void the District Court Judgment.  This Court has
> previously held that the rendering court is the proper forum to review whether a
> party has violated a court order.  *See Geltzer v. Brizinova* (*In re Brizinova*), 565
> B.R. 488, 503 (Bankr. E.D.N.Y. 2017).  As this Court has noted, such a "rule
> makes sense, for several reasons [including that it] promotes clarity and
> predictability."  *In re Brizinova*, 565 B.R. at 503.  For similar reasons, the District
> Court that entered the District Court Judgment, and not this Court, is the
> appropriate forum to consider Mr. Choez's challenge to that judgment.

*In re Choez*, 2017 WL 5604109, at *12.

For substantially the same reasons as stated in *In re Choez*, here, the Court concludes that

the proper forum for the consideration of this claim is the District Court that entered the District

Court Judgment, and not this Court.

For these reasons, and based on the entire record, Mr. Choez has not shown that he is

entitled to a declaratory judgment voiding the District Court Action for lack of personal

jurisdiction.

## **Conclusion**

For the reasons stated herein, and based on the entire record, the Court finds that Alliance

has not established any of the elements of its Bankruptcy Code Section 523(a)(4) claim, that a

PACA trust existed and was preserved, that Mr. Choez acted in a fiduciary capacity with respect

to that trust, or that Mr. Choez's actions amounted to a fiduciary defalcation with respect to that

trust.  And for these reasons, and based on the entire record, the Court finds that the debt owed

by Mr. Choez to Alliance is dischargeable under Bankruptcy Code Section 523.  For these same reasons, and based on the entire record, Alliance is not entitled to an award of its counsel fees and costs of suit.

Separately, for the reasons stated herein, and based on the entire record, the Court finds that Mr. Choez has not established that the District Court Judgment is void for lack of personal jurisdiction.

An order and judgment in accordance with this Memorandum Decision after Trial will be entered simultaneously herewith.



**Dated: Brooklyn, New York**                                    **Elizabeth S. Stong**
**October 26, 2018**                                    **United States Bankruptcy Judge**